(No. 42161.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
THOMAS HOLIDAY, Appellant.

*Opinion filed December 4, 1970.*

Kenneth L. Gillis, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Edward V. Hanrahan, State's Attorney, of Chicago, (James B. Zagel, Assistant Attorney General, and Elmer C. Kissane and John R. McClory, Assistant State's Attorneys, of counsel,) for the People.

Mr. Chief Justice Underwood delivered the opinion of the court:

A Cook County circuit court jury found defendant Thomas Holiday guilty of murder, and he was subsequently sentenced to imprisonment for a term of 75 to 100 years. On this appeal, he challenges the constitutionality of the alibi-notice statute (Ill. Rev. Stat. 1967, ch. 38, par. 114—14); argues that admission of allegedly tainted identification testimony constituted a denial of due process; alleges several errors at trial; and finally contends that he was not proved guilty beyond a reasonable doubt.

Numerous arguments are raised in connection with the

alibi statute. It is contended that the requirement of compliance with the State's pretrial request for a list of alibi witnesses violates the constitutional rights to remain silent, to equal protection, to due process and fundamental fairness, and to compulsory process for the attendance of witnesses. The United States Supreme Court recently addressed the fifth-amendment-right-to-remain-silent issue in the context of a challenge to Florida's notice-of-alibi rule (33 F.S.A. Rules of Criminal Procedure, Rule 1.200,), and concluded that "the privilege against self-incrimination is not violated by a requirement that the defendant give notice of an alibi defense and disclose his alibi witness.[14]" (*Williams* v. *Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893, 1897.) The Supreme Court noted, in footnote 14 to its opinion, that the validity of the rule's sanction, *i.e.*, denial of the right to present alibi witnesses not earlier disclosed in compliance with the requirements of the rule, was not in issue where the defendant had complied with the rule. The instant case comes before us in the same posture, defendant Holiday having complied with section 114—14, and not having been denied the opportunity to present any alibi witness. Therefore, we do not confront an issue arising upon restriction of the right to compulsory process. (U.S. Const., Amend. VI; Ill. Const., art. II, sec. 9.) The equal-protection argument raised by defendant is without merit. It is argued that the requirement that defendants with an alibi defense make a disclosure of pertinent facts and witnesses operates to discriminate against such defendants as opposed to defendants with other defenses not subject to disclosure. This equal-protection argument has merit only if we concede that there is no reasonable justification for the separate classification of defendants intending to present an alibi defense; however, the prospect of surprise alibi defenses is singularly undesirable and deserving of separate treatment, inasmuch as an alibi may be manufactured and, absent prior notice, difficult to refute. Thus, the separate

classification, for discovery purposes, of defendants proposing to present alibi defenses is not an arbitrary denial of equal protection of the laws. See *Williams* v. *Florida,* 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893.

The final argument presented by defendant is essentially a matter of "fundamental fairness": the defendant must disclose his alibi witnesses, although the State is not required to make a reciprocal disclosure of alibi rebuttal witnesses. This question was not before the Supreme Court in *Williams,* since, in addition to liberal provisions for discovery by the defendant (see 33 F.S.A. Rules of Criminal Procedure, Rule 1.220), the Florida alibi-notice rule itself required reciprocal disclosure by the State of alibi rebuttal witnesses. (33 F.S.A. Rules of Criminal Procedure, Rule 1.200.) However, the court suggested that its conclusions as to the validity of other alibi-notice statutes under due-process-fair-trial standards might depend upon "an inquiry, for example, into whether the defendant enjoys reciprocal discovery against the State." (*Williams* v. *Florida,* 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893, 1896 n. 11.) In Illinois, the defendant is entitled to substantial discovery, including confessions and confession witnesses (Ill. Rev. Stat. 1967, ch. 38, par. 114—10), evidence in the State's possession favorable to defendant (*People* v. *Moses,* 11 Ill.2d 84; see also *People* v. *Cagle,* 41 Ill.2d 528; *People* v. *Hoffman,* 32 Ill.2d 96), prosecution witness's prior recorded statements, grand jury testimony, and reports, for use in impeachment (*People* v. *Wolff,* 19 Ill.2d 318, *cert.* den. 364 U.S. 874, 5 L. Ed. 2d 96, 81 S. Ct. 119; *People* v. *Johnson,* 31 Ill.2d 602; *People* v. *Neiman,* 30 Ill.2d 393), and any document used by a prosecution witness, during or before his testimony, to refresh his present recollection (*People* v. *Scott,* 29 Ill.2d 97). In addition, section 114—9 of the Code of Criminal Procedure affords discovery of prosecution witnesses. (Ill. Rev. Stat. 1967, ch. 38, par. 114—9(a).) However, as above noted, the alibi-notice

statute does not provide for discovery of the State's alibi rebuttal witnesses (see Ill. Rev. Stat. 1967, ch. 38, par. 114—14), and the provision entitling defendants to discovery of "prosecution witnesses" expressly excludes "rebuttal witnesses" from its purview. (Ill. Rev. Stat. 1967, ch. 38, par. 114—9(c).) Provision for discovery of alibi-rebuttal witnesses would act to further implement the concept of a trial as a search for the truth, and we commend the matter as an appropriate subject for consideration by the General Assembly. Nevertheless, we do not feel that the discoverability of alibi-rebuttal witnesses is an essential element of due process where the defendant is otherwise accorded substantial discovery of prosecution witnesses. Indeed, the true parallel in the State's case to the alibi witness is the occurrence eyewitness, who is readily discoverable by the defendant. We hold, therefore, that the requirements of the alibi-notice statute, considered in conjunction with the defendant's discovery rights, are consonant with the fundamental-fairness-due-process concept.

Treatment of defendant's challenge to the admissibility of eyewitness identification testimony requires substantial review of the facts. Maurice Lee was walking with his 16-year-old wife, Sharon Lee, in an easterly direction on 47th Street in Chicago at approximately 2 :oo A.M. on the morning of June 8, 1968. The couple, both Negroes, were accosted by a group of three or four young male Negroes who argued with Maurice Lee about the Blackstone Rangers and their "territory". They began fighting with Lee, and were joined by several other youths; after a few minutes Steve McCorry, who was convicted with Holiday in a joint trial, was dispatched to "get the heat". He returned a few minutes later with another youth, alleged to be Holiday, who shot Lee in the chest. The assailants ran, and Lee died shortly thereafter of the wound. Co-defendant McCorry was arrested within fifteen minutes; Holiday was arrested some three hours later as he was walking up the front porch steps

to enter his home. Sharon Lee meanwhile enlisted the aid of a passing motorist to transport her husband to the hospital, where he was pronounced dead-on-arrival, and she there identified the recently arrested co-defendant McCorry. She then completed her report to the police at police headquarters, and went to her mother's home. At approximately 6:30 A.M., two officers brought Holiday to the home of the mother, Estelle Mobley, for Sharon Lee to view him. Mrs. Mobley apparently refused to permit the officers to disturb her daughter, and no show-up took place. At 11:00 A.M. two other officers arrived, and the challenged photographic viewing occurred in which Sharon Lee identified a 3-view color polaroid photo of Holiday as being the "shooter". She testified at trial as to this photo identification, and also made an in-court identification of Holiday. One other witness, Ernest Robinson, did likewise. He had been parked in his car headed west on 47th Street, and the altercation commenced within a few feet of his car. The group had moved east to a point 65-70 feet away, still on the sidewalk, when McCorry returned with the "shooter". Robinson was questioned at the scene by investigating officers, but declined to give his name at that time. The officer took his auto license number, however, and he was subpoenaed for the trial five months later. He was shown the three-view photos of each defendant at the time of trial before appearing as a witness, and testified to his identification of defendant's photo as well as his in-court identification.

Defendant Holiday moved prior to trial to suppress Sharon Lee's identification testimony, both as to photos and in-court, on the grounds that the photo identification procedure was conducted in the absence of counsel for defendant and was unnecessarily suggestive and lacking in fairness. The trial court dismissed the motion without an evidentiary hearing, apparently accepting the State's argument that the *Wade-Gilbert* cases were not applicable to photographic identifications and that therefore there was no need

306

for a hearing. (See *United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.) The conclusion was apparently based upon a reading of the then recent decision in *Simmons* v. *United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, holding that a prearrest viewing by witnesses of defendant's photo did not violate the right-to-counsel strictures of *Wade-Gilbert.* As to witness Robinson, defendant did not move to suppress his identification testimony. However, there was an objection made to his appearance as a witness without having been named prior to trial. This objection was apparently overruled on the basis of an agreement that the witness would be made available for an interview by defense counsel prior to his testimony in the trial. We do not find any waiver of due-process contentions as to Robinson's identification, by virtue of defendant's failure to move for its suppression, since the court's ruling on the motion to suppress Sharon Lee's identification indicated that such a motion as to Robinson would have been a useless act. See *People* v. *Cage,* 34 Ill.2d 530, 534.

At this juncture we find it appropriate to resolve defendant's contention that the *Wade-Gilbert* right-to-counsel doctrine should be applied to photographic identification procedures which take place, as here, while the defendant is in custody. It is strongly urged that the rationale of the *Simmons* case "exempts" only precustody photographic identifications, on the basis that they are an aid to investigation and, of course, are the only means of identification available when defendant's absence makes a lineup viewing impossible. Moreover, a requirement that counsel be present at precustody photo viewings would effectively bar such procedures altogether, since no counsel is available to act for suspects prior to arrest. By way of contrast, it is argued that when a suspect is in custody, no investigatory purpose remains to be served—the identification procedures become

more prosecutorial in purpose when an individual has been arrested. There is no need to resort to the use of photographs when a suspect is available for a fair lineup, which may be expected to yield a better opportunity for observation and accurate identification. We agree that the use of photographs as a basis for identification is ordinarily not a desirable practice when the suspect is in custody and a lineup is feasible, for the photo procedure detracts from the quality of any identification which follows. We believe that photographic identification procedures ought not to be employed when the suspect is in custody and a lineup is otherwise feasible. We do not, however, find that the *Wade-Gilbert* doctrine requires the presence of defense counsel at photographic identification proceedings where the defendant himself is not present. The doctrine of *Wade-Gilbert* relates to the right to an accused to the assistance of counsel, and is premised upon the occasion of a confrontation between the accused and a witness for the prosecution. See, *e.g., United States* v. *Ballard* (5th cir., 1970), 423 F.2d 127; *United States* v. *Bennett* (2d cir., 1969), 409 F.2d 888, *cert.* den., 396 U.S. 852, rehearing den. 396 U.S. 949; *McGee* v. *United States* (10th cir., 1968), 402 F.2d 434, *cert.* den., 394 U.S. 946; *contra, Thompson* v. *State* (Nev. 1969), 451 P.2d 704.

We must attempt to determine from the trial record whether the photo identification procedures were improper, and, if so, what consequences should follow upon admission of the identification testimony at trial The totality of the circumstances surrounding the photographic identifications must be scrutinized according to the standards set forth in *Simmons,* where the court held "that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very

substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377 at 384, 19 L. Ed. 2d at 1253, 88 S. Ct. 967 at 971.

Sharon Lee was shown defendant's photograph at approximately 11:00 A.M. on June 8, nine hours after witnessing the shooting and death of her husband. She was sixteen years old, pregnant, and had not slept. According to her mother, who was present at the viewing of the photo, "She was very upset". In such circumstances, care must be taken to assure that an identification procedure is conducted fairly. Yet, according to Sharon Lee, the officers presented her with a single color polaroid photograph of defendant, showing three views, and told her to look at it carefully. Her mother also recalls that the officers presented her with but one photograph. Detective Hill said he brought the recent photo of defendant along with "several other photographs" which he cannot now produce. Some were in color, some were not; asked if the other were polaroid prints, he answered, "Some were, maybe some weren't, I don't recall." "Can you state for sure that any of the other photographs were polaroid photographs?" "I know one other one was the black and white of that same person [defendant] that is on that picture." Some of the other pictures had dates on the front; he could not recall the clothing worn by the subjects in the other photos. In the color photo, defendant was wearing the green shirt and dark pants which he was wearing when arrested, and was wearing a "tiki'" around his neck which he was carrying at the time of arrest. Sharon Lee's earlier description of the shooter included such items of clothing. The officer who showed her defendant's picture said she looked at it "a very short time" and announced "that is definitely the person." He was asked if her examination of the photo was for a period of four or five minutes, and responded, "It might have been, might have been less." Sharon Lee's mother recalled, "I couldn't tell you approximately how long she looked at the photograph but she just

did not pick it up and look at it and say that was him." She was then asked, "She looked at it for a considerable length of time, would you say three or four minutes?" She replied, "At least four minutes, maybe five."

The circumstances of the showing to Ernest Robinson are more clearly established. He arrived at the inception of the trial, and was shown the color photo of defendant and a similar photo of the co-defendant. The assistant State's Attorney "asked me if I could identify them." He did so. There is no contention that he was presented with a group of photographs.

The opportunity of Sharon Lee and Ernest Robinson to observe the "shooter" is critical to a determination whether their viewing of defendants' photograph was likely to lead them to make a mistaken identification. Sharon Lee observed the shooter for "only a few seconds" at a distance of about five feet; there were street lights across the street, and the lighting was "adequate"—"you could see anything you waned to see"; there was little or no traffic on the street; she waved to a passing police car during the fight, but apparently was not seen, as the car did not stop. Ernest Robinson saw the assailant as he ran past his car toward the fight; there was a passenger in Robinson's car between him and the sidewalk to the right, but his view was not obstructed; he could see the scene of the shooting clearly through the rear window of his car; his view of the assailant at the time of the shooting was obscured—"I didn't get a good view because there was people around but you could see the blast from the gun and the man running"; he ducked after the shots were fired, and apparently did not see the "shooter" again. A third witness, Velvie Gibson, was double-parked across the street, also about 65-70 feet from the shooting. He was unable to identify the attackers or describe their clothing; he could only say they were all Negroes; "Well, the street lighting at this particular place wasn't real bright street lighting but it's a little bit dim

right at this particular spot from where I was sitting. To me it was a little dim but nevertheless it wasn't too dim for me to see the fires from this gun."

Sharon Lee's description of the shooter, given to the investigating officers, was "Male Negro, 20-21, 5'10" or 11", 140, brown skin, bushy hair, light green shirt with short sleeves, black pants, Tiki around neck." She agreed that the shooter was "definitely taller" than she, yet both Sharon Lee and defendant Holiday are 5'7". Ernest Robinson is also 5'7", and he, too, stated that "I know he was taller than I, maybe two or three inches taller." Neither witness could recall which hand the shooter held the gun in, and Sharon could not remember the color of the tiki around his neck; she "couldn't make out" what the tiki was "at the time". She "was paying attention to his face." She did not tell the police that he had a mustache. She still maintained that the shooter had bushy hair, although she would not so characterize defendant's hair, in the picture taken a few hours after the shooting. She was asked, "As a matter of fact, you are not sure about any facts about the shooter, are you?" and replied, "Yes, I am sure of the clothing he was wearing." Robinson's recollection also seemed to be focused somewhat on the clothing of the attackers. Before viewing the photos, he recalled telling the assistant State's Attorney "what I thought they were wearing, how they were built." Asked to describe the other assailants, he replied, "They had on all of those colors, they were some with purple, some with pink, some with all those chartreuse colors." When asked if he remembered the shooter's pants as being "blue or purple, kind of changing colors, is that right?", he responded, "It was one of them loud colors, they were loud colors."

On the basis of the information before us, as to the opportunity of the witnesses to observe the "shooter", the circumstances of the photographic showings, and the quality and strength of their identification testimony, we cannot

conclude that their identification testimony was properly admitted without the preliminary evidentiary hearing which was denied. Their opportunity to observe was limited, the showing of defendant's photograph may have been suggestive as to each witness, and the identification testimony reveals several inconsistencies and weaknesses. However, we would not be justified in concluding, on the basis of the record before us, that the identification testimony was inadmissible. That determination must be based on the totality of the circumstances, some of which may not be in the record due to the absence of a hearing on the issue. Thus, while it appears probable that the identification procedures used with the two witnesses were impermissibly suggestive and conducive to mistaken identification, we cannot foreclose the possibility that further circumstances may be revealed which clearly establish that the identifications were not the result of the suggestive procedures.

We accordingly vacate the judgment and remand to the trial court for the purpose of conducting a hearing into the circumstances bearing on admissibility of identification testimony by Sharon Lee and Ernest Robinson. We have found no merit in defendant's other claims of reversible error, nor are we persuaded that the evidence, if properly admitted, failed to prove defendant's guilt beyond a reasonable doubt; therefore, in the event the testimony is found to have been properly admitted, the conviction will be reinstated. Defendant must be afforded a new trial if the testimony of either witness is found to have been inadmissible, since the erroneous admission of either witness's testimony must be deemed prejudicial when the only evidence against defendant was their identification testimony, and defendant presented an otherwise substantially unimpeached alibi based upon three witnesses.

*Vacated and remanded, with directions.*